FORD MOTOR CREDIT COMPANY
v.
SARA M. DUNHAM AND LEZLE DUNHAM-HARTMAN
No. 2009 CA 0615.
Court of Appeals of Louisiana, First Circuit.
December 23, 2009.
Not Designated for Publication
DAVID M. ELLISON, JR. Counsel for Plaintiff-In-Reconvention/Appellant Sara M. Dunham.
SCOTT C. BARNEY PETER A. FERINGA, JR. MATT N. TERRELL, Counsel for Defendant-In-Reconvention/Appellee Ford Motor Credit Company.
CHAD A. SULLIVAN Counsel for Defendant-In-Reconvention/Appellee Capitol Motor Company.
Before: WHIPPLE, HUGHES, and WELCH, JJ.
HUGHES, J.
This is an appeal from a judgment on a reconventional demand denying damages to a plaintiff-in-reconvention whose signature as a cosigner was forged on a vehicle purchase loan. Plaintiff-in-reconvention sought damages against both the vehicle dealer who took the forged signature and the lender who filed suit on the note. Although negligence was found on the part of the dealer, the jury determined the negligence was not a legal cause of the plaintiff-in-reconvention's damages and no damages were awarded. This appeal followed. For the reasons set forth herein, we reverse and render judgment.

FACTS AND PROCEDURAL HISTORY
In February of 2002 Lezle Dunham[1] ("Lezle") negotiated the purchase of a vehicle from Capitol Motor Company ("Capitol") in Sante Fe, New Mexico, where she had previously purchased vehicles in 1999 and 2000. Capitol required a co-signer for Lezle's new loan, which was to be assigned to Ford Motor Credit Company ("Ford").[2] Lezle provided Capitol with the financial information of her mother, Sara M. Dunham, who had co-signed the loan for the vehicle she purchased from Capitol in 1999 and who Lezle represented was also willing to co-sign the 2002 loan. Mrs. Dunham had personally gone to the Capitol business premises in 1999, presented her driver's license, and co-signed the loan documents. However, in 2002, Capitol allowed Lezle to take the paperwork to Baton Rouge for her mother to sign.[3] Capitol did not thereafter verify that the signature affixed to the loan documents that Lezle returned to Capitol, purportedly containing the signature of Mrs. Dunham, was in fact that of Mrs. Dunham. The Capitol salesman, John Herbrand, acknowledged that he did not speak to Mrs. Dunham concerning the transaction.
A short time after the sale was completed (within that month), Mrs. Dunham discovered that Lezle was driving a new vehicle, which prompted Mrs. Dunham to call John Herbrand (who had also been the salesman on the 1999 vehicle sale) and make inquiries. When Mr. Herbrand informed Mrs. Dunham that Lezle had obtained a co-signer signature on the financing agreement purporting to be Mrs. Dunham's, Mrs. Dunham informed Mr. Herbrand that she had not agreed to co-sign the loan and did not sign the documents. Thereafter, Mr. Herbrand reported this conversation to his Capitol supervisor and also placed a call to Lezle, who indicated that she and her mother had a difficult relationship and that sometimes her mother just "does these things." When Mr. Herbrand spoke again to Mrs. Dunham, he asked whether she wanted Capitol to take "drastic" action and was met with what he perceived to be hesitancy. Mr. Herbrand and his supervisor decided to wait and see if Lezle and her mother would work things out. No information was provided by Capitol to Ford concerning the alleged forgery of Mrs. Dunham's signature at that time. Lezle defaulted on the loan in October or November of 2003.
In the course of its collection efforts, Ford contacted Mrs. Dunham by telephone and was informed by Mrs. Dunham of the alleged forgery. However, Ford declined to discontinue its collection efforts against Mrs. Dunham unless she submitted an affidavit attesting to the forgery and a copy of a police report. On February 23, 2004 Ford filed suit against both Lezle and Mrs. Dunham for the unpaid balance and other specified damages authorized under the terms of the promissory note. In response, Mrs. Dunham filed an answer and reconventional demand in March 2004, denying liability under the note and further alleging: that her signature thereon was a forgery; that Capitol facilitated the perpetration of the forgery by its negligence; that Capital acted as the agent of Ford in the preparation and completion of the finance documents; that Ford filed false and negative credit reports with a national credit reporting agency, thereby damaging her credit and resulting in a subsequent denial of credit by another lender; and that, despite having been advised of the forgery, both Capitol and Ford failed to take any reasonable step to determine who had signed the loan documents. Mrs. Dunham further alleged that Ford's and Capitol's negligence, along with Ford's efforts to unlawfully collect the debt from her, had caused her damage, which included: mental and physical pain and suffering, inconvenience, aggravation, humiliation, and embarrassment. Defendantsin-reconvention, Ford and Capitol, both filed cross-claims against Lezle, seeking contribution and/or indemnification should Mrs. Dunham succeed in her reconventional demand, and asserting that any such damage to Mrs. Dunham resulted solely from the intentional or negligent acts of Lezle.
Mrs. Dunham's reconventional demand was tried by jury on October 27-30, 2008. The jury returned the following answers to the jury interrogatories:
1. Do you find by a preponderance of the evidence that:
(a) Capitol Motor Company was negligent as alleged by Sara Dunham?
 Answer: Yes: √ No: ___
If your answer to Question 1(a) is "Yes, "proceed to sub-part (b). If your answer is "No, "please proceed to question 2.
(b) Was such negligence of Capitol Motor Company a legal cause of the Sara Dunham's damages?
 Answer: Yes: ___ No: √
If your answer to Question 1(b) is "Yes, "proceed to sub-part (c). If your answer is "No, "please proceed to question 2.
(c) Was Capitol Motor Company acting within the scope of any agency authority granted it by Ford Motor Credit Company when it caused Sara Dunham's damages?
 Answer: Yes: ___ No: ___
Please proceed to Question 2.
2. Do you find by a preponderance of the evidence that:
(a) Ford Motor Credit Company was negligent as alleged by Sara Dunham?
 Answer: Yes: ___ No: √
If your answer to Question 2(a) is "Yes, " proceed to sub-part (b). If your answer is "No, "please proceed to question 3.
(b) Was such negligence of Ford Motor Credit Company a legal cause of Sara Dunham's damages?
 Answer: Yes: ___ No: ___
Please proceed to Question 3.
3. Do you find by a preponderance of the evidence that:
(a) Plaintiff, Sara Dunham, was negligent and/or failed to mitigate her damages?
 Answer: Yes: √ No: ___
If your answer to Question 3(a) is "Yes, " proceed to sub-part (b). If your answer is "No," please proceed to question 4.
(b) Was Sara Dunham's negligence and/or her failure to mitigate her damages a legal cause of Sara Dunham's damages?
 Answer: Yes: √ No: ___
Please proceed to Question 4.
4. Do you find by a preponderance of the evidence that:
(a) Lezle Dunham-Hartman was at fault?
 Answer: Yes: √ No: ___
If your answer to Question 4(a) is "Yes, " proceed to sub-part (b). If your answer is "No, "please proceed to question 5.
(b) The fault of Lezle Dunham-Hartman was a legal cause of Sara Dunham's damages?
 Answer: Yes: √ No: ___
Please proceed to Question 5.
5. Please state the percentage of fault, if any, attributable to Sara Dunham, Lezle Dunham, Capitol Motor Company, and Ford Credit Motor Company. (Please note that the total of your percentages must equal 100%).

 Sara Dunham: 25 %
 Lezle Dunham-Hartman: 50 %
 Capitol Motor Company: 20 %
 Ford Motor Credit Company: 5 %

6. Please state the sum of money, if any, which would reasonably and fairly compensate Sara Dunham for the following:

 (a) Past pain and suffering $ 0
 (b) Future pain and suffering $ 0
 (c) Loss of enjoyment of life $ 0
 (d) Past and Future mental pain and anguish $ 0
 (e) Damage to credit $ 0

In accordance with the jury's verdict, a judgment was signed on November 25, 2008 in favor of Capitol and Ford, dismissing Mrs. Dunham's reconventional demands. Mrs. Dunham appealed this judgment and on appeal asserts the district court erred: (1) in concluding that Mrs. Dunham was negligent to the extent of 25% and failed to mitigate her damages; (2) in limiting the negligence of Ford to 5% and in failing to conclude that Ford's negligence was a legal cause of Mrs. Dunham's damages; (3) in failing to decide that Capitol was acting as an agent for Ford at all pertinent times; (4) in limiting the negligence of Capitol to 25% and in failing to find that the negligence of Capitol was a legal cause of Mrs. Dunham's damages; (5) in concluding that the negligence of Lezle was a legal cause of Mrs. Dunham's damages to the extent of 50%; and (6) in failing to award damages to Mrs. Dunham for past and future pain and suffering and for past and future mental pain and anguish. On appeal, both Capitol and Ford have filed exceptions of prescription, contending that Mrs. Dunham's claims prescribed prior to her filing of the reconventional demand. Mrs. Dunham has filed a motion to strike the exception of prescription filed by Capitol. Also, Capitol and Ford have each filed answers to this appeal seeking modification of the district court judgment to reflect that they were without fault. Ford further assigns as error the failure of the district court to grant summary judgment in its favor based on the Federal Credit Reporting Agency Law (15 U.S.C. §1681, et seq.). Capitol also assigns as error the percentages of fault assigned to Mrs. Dunham and to Lezle Dunham, requesting additional fault be allocated to them.

LAW AND ANALYSIS

Exception of Prescription
At the outset we address Mrs. Dunham's motion to strike Capitol's exception of prescription filed in this court. Mrs. Dunham contends that Capitol previously presented its exception of prescription to the district court and it was denied; therefore, she asserts that Capitol should have raised this issue on appeal only by means of an appeal, rather than by filing the motion anew. Capitol concedes that it moved for dismissal of Mrs. Dunham's reconventional demand on the basis of prescription at the close of her casein-chief. We note that prescription was also alleged in Capitol's answer to the reconventional demand. Capitol maintains that it has raised the issue of prescription in this court via its answer to Mrs. Dunham's appeal, as well as by means of a separate motion; therefore, it claims the motion to strike is without merit. We agree.
Article 2133 of the Code of Civil Procedure provides that an appellee who wishes to have a judgment "modified, revised, or reversed in part" must file an answer to the appeal, stating the relief demanded. As provided in Article 2133, an answer filed by the appellee "shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer." Further, an appellee is authorized by Article 2133 to " demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court" by means of his answer to the appeal.
In the instant case, Capitol raised its assertion, that the relief claimed by Mrs. Dunham in her reconventional demand was prescribed, in both its answer to the appeal and by means of a separate exception of prescription filed in this court. Therefore, we conclude that Capitol has properly preserved its right to have the issue reviewed on appeal, and Mrs. Dunham's motion to strike is without merit.
On the merits of the exceptions of prescription filed by both Capitol and Ford, it is contended that because Mrs. Dunham testified she became aware of the forgery of her signature as co-signer for Lezle's vehicle loan sometime on or about February 2002, her right to bring an action on any negligence associated with Capitol's or Ford's failure to prevent the forgery prescribed in 2003. Thus, Capitol and Ford argue that Mrs. Dunham's claims asserted in her reconventional demand filed in March 2004 were prescribed.
Under LSA-C.C. art. 3492, delictual actions are subject to a one-year liberative prescription, which runs "from the day injury or damage is sustained." Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. Louisiana courts have recognized that a claimant may not become aware of damages suffered as a result of tortious conduct under certain circumstances until after damage has been inflicted. In such cases, prescription will begin to run when the damage is sustained. However, the doctrine of contra non valentem will suspend the running of the prescriptive period until the claimant knows or should reasonably know that he/she has suffered damages. See Brown v. R.J. Reynolds Tobacco Company, 52 F.3d 524, 527 (5th Cir. 1995) (citing Cole v. Celotex Corporation, 620 So.2d 1154, 1156 (La. 1993); Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La. 1992); Owens v. Martin, 449 So.2d 448, 451 n.4 (La. 1984); Corsey v. State Department of Corrections, 375 So.2d 1319, 1322 (La. 1979); Jones v. Texas & P. Ry. Co., 125 La. 542, 545, 51 So. 582, 583 (La. 1910)).
In the instant case, although Mrs. Dunham learned of the forgery soon after its occurrence (in February 2002), she was not aware that she had suffered damage until after the October or November 2003 loan default by Lezle, when Ford began to demand payment from her (Mrs. Dunham). Also, in January 2004, Mrs. Dunham was informed by the Baton Rouge Mercedes Benz dealership, when the company viewed her credit report with respect to a new vehicle loan sought by Mrs. Dunham's other daughter and for whom Mrs. Dunham intended to co-sign the vehicle loan, that derogatory information relating to the Capitol/Ford loan was appearing on her credit bureau report. Therefore, we conclude that prescription could not have begun to run on any tortious conduct associated with the forgery until such time as Mrs. Dunham learned that she had suffered damage or injury therefrom; i.e., at the earliest, in October 2003. Accordingly, the claims asserted in Mrs. Dunham's March 2004 reconventional demand were not prescribed.

Legal Error in Jury's Answers to Jury Interrogatories
Our review of the jury's findings on the main demand in this case, as reflected in the answers to the jury interrogatories, reveals patent legal error in the jury's findings. In response to the first jury interrogatory, the jury found Capitol was negligent, but that the negligence was not a legal cause of Mrs. Dunham's damages. Nevertheless, in response to the fifth jury interrogatory, the jury assigned a percentage of fault to Capitol. Similarly, the jury stated in response to jury interrogatory number two, that Ford was not negligent (and therefore the question of legal cause was not addressed); however, the jury went on to assign a percentage of fault to Ford in response to jury interrogatory number five.
In order to prevail in a tort suit, a plaintiff must establish that the defendant is negligent (a duty was breached that was a cause-in-fact of the plaintiffs injuries) and also that the negligence was a legal cause of the harm to plaintiff (whether the plaintiffs injury was one of the risks encompassed by the duty). See Detraz v. Lee, XXXX-XXXX, p. 8 (La. 1/17/07), 950 So.2d 557, 562. Only a defendant who has contributed to the injury of the plaintiff is assigned a percentage of fault under comparative negligence principles. See LSA-C.C. art. 2323. Therefore, the assignment of a percentage of fault to both Capitol (found negligent but not a legal cause of Mrs. Dunham's damages) and Ford (found not to be negligent) was legal error, based on the jury's factual findings that neither Capitol nor Ford contributed to Mrs. Dunham's damages.
Furthermore, we find manifest error, as stated hereinbelow, in the factual findings of the jury on the issues of Capitol's and Ford's fault.

Capitol's Fault
Although during the course of this suit, Mrs. Dunham is referred to as having been a "co-signer" on Lezle's loan, the vehicle retail installment contract designated Mrs. Dunham as a "buyer," and Lezle was designated as a "co-buyer." While Mrs. Dunham has ostensibly been made a party to the purchase and financing of the vehicle at issue, Capitol failed to obtain Mrs. Dunham's consent to the contract. A contract is formed by the consent of the parties established through offer and acceptance. LSA-C.C. art. 1927. As a result, no contract was formed between Capitol or its successor-ininterest, Ford, and Mrs. Dunham.
Capitol's negligence in facilitating Lezle's forging of Mrs. Dunham's signature onto the contract documents clearly contributed to the injury to Mrs. Dunham. Had Capitol undertaken any number of simple measures to verify Mrs. Dunham's consent to the contract (ranging from requiring notarization of the signature to simply telephoning Mrs. Dunham), the forgery would not have taken place.
Our review of the record presented on appeal reveals no reasonable factual basis for the jury to have found otherwise. Thus, we conclude that the jury erred in failing to find Capitol negligent and that this negligence was a legal cause of Mrs. Dunham's damages.

Ford's Fault
In assessing Ford's fault, we first examine whether Ford is legally responsible for the fault of Capitol. Mrs. Dunham contends that, in the loan transaction at issue herein, Capitol acted as an agent for Ford "by way of encouraging the customer to apply for financing from Ford, by filling out the requisite credit applications and forms supplied by Ford and by informing the customer of Ford's approval for financing." Ford maintains that the jury did not err in concluding Mrs. Dunham failed to produce sufficient proof of an agency relationship.
A person may represent another person in legal relations as provided by law or by juridical act. LSA-C.C. art. 2985. The authority of the representative may be conferred by law, by contract, such as mandate or partnership, or by the unilateral juridical act of procuration. LSA-C.C. art. 2986. A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. LSA-C.C. art. 2989. In all matters for which no special provision is made in the Title, "Representation and Mandate" (LSA-C.C. arts. 2985-3032), the contract of mandate is governed by the Titles of "Obligations in General" and "Conventional Obligations or Contracts." LSA-C.C. art. 2990. The contract of mandate is not required to be in any particular form. Nevertheless, when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form. LSA-C.C. art. 2993. The form of the contract of mandate is subject to the general law governing proof of obligations. LSA-C.C. art. 2993, Comment (b) (citing LSA-C.C. arts. 1832,[4] 1837,[5] and 1846[6]).
The testimony presented in this case by both Ford and Capitol employees established the following pertinent facts, which were not rebutted by Mrs. Dunham: Capitol was the original lender named in Lezle's new vehicle loan documents; the loan was later assigned to Ford; Capitol regularly assigns loans to Ford, but the arrangement is not exclusive; Capitol also assigns loans to other lenders; the applications for loans intended to be assigned to Ford are electronically transmitted to Ford during the application process for pre-approval; and Ford requires Capitol to use its loan forms, but other lenders used by Capitol also accept the Ford forms. Ford's "Dealer Manual" was also introduced into evidence, containing the terms governing its relationship with Capitol. With respect to retail financing forms, the manual provided:
Under [The Retail Plan], Ford Credit purchases acceptable retail installment contracts from the Dealer....
* * *
Ford Credit provides the Dealer with the forms necessary to complete retail installment contracts that he or she may offer to Ford Credit for purchase. These forms are:
 Contract Form  to evidence the agreement, to list the conditions of the time sale, to disclose the elements of the transaction and to provide for a security interest in the vehicle until the customer completes payment.
 Customer's Application Statementto record information necessary to establish credit.
 Agreement to Provide Insurance  to provide evidence of vehicle insurance coverage.
 Notice to Co-Signer  to define the legal obligation of individuals signing a contract as co-signer/guarantor.
Extreme care is required in completing retail installment contracts and forms, and the Dealer remains responsible for errors or inaccuracies in all contracts completed by the Dealer that may be purchased by Ford Credit....

* * *

The Dealer unconditionally guarantees and remains fully responsible for repurchasing from Ford Credit, upon demand, for the full amount remaining unpaid thereunder:
* * *
 Any retail installment contract (irrespective of the form of assignment):
* * *
... With respect to which any material misrepresentations were made in the transaction details or the credit application process that were relied on by Ford Credit in its decision to purchase the contract, without regard to the Dealer's knowledge or lack of knowledge of such misrepresentations ....
(Emphasis added.)
After review of the evidence presented, we do not find that Mrs. Dunham established by a preponderance of the evidence that Capitol acted as the agent of Ford in the instant transaction. Consequently, we conclude that any negligence on the part of Capitol cannot be attributable, on the basis of agency principles, to Ford.
Despite our conclusion that Ford is not legally responsible for the actions of Capitol, we believe the facts of this case, as established by the evidence in the record on appeal, warrant a finding that Ford committed independent negligent acts that contributed to the harm suffered by Mrs. Dunham; i.e., Ford continued collection efforts against Mrs. Dunham despite being advised that she was not a party to the loan contract.
Ford's loss prevention agent, Virginia Wigger, who participated in the collection efforts against Mrs. Dunham, admitted that Mrs. Dunham "stated over the phone that she did not sign the contract." Further, an attorney retained by Mrs. Dunham, Franklin J. Foil, testified that he transmitted written correspondence to Ford stating that Mrs. Dunham was not a party to the loan contract. Nevertheless, the evidence established that Ford persisted in demanding that Mrs. Dunham institute criminal charges by filing a police report and execute a sworn identity theft affidavit before it would undertake any investigation of Mrs. Dunham's assertion.
At the very least, Ford could have examined the loan documents forming the basis of the obligation it claimed Mrs. Dunham owed. If Ford had done so, the truth of Ms. Dunham's assertion that she had not signed these documents would have been suggested, as the signatures of Lezle and Mrs. Dunham appear to have been written by the same person. Ford could further have contacted Capitol to determine whether the Capitol employee(s) involved in the completion of these documents had actually verified that Mrs. Dunham signed the forms (which Capitol could not have truthfully answered in the affirmative). If Ford had made these two simple inquiries, it would have determined that it had no legal basis for enforcing the loan against Mrs. Dunham. Under these particular facts and circumstances, we find that the only reasonable factual conclusion was that Ford was negligent in failing to verify that Mrs. Dunham owed the debt asserted.[7] Accordingly, we find the jury manifestly erred in failing to find Ford negligent. We further find that Ford's negligence was a legal cause of Mrs. Dunham's damages.

Percentages of Fault
Having found both legal error and manifest error in the jury's determinations concerning fault in this case, we conclude that the assessment of the percentages of fault attributable to the parties to this suit was tainted by those errors. Therefore, based on own thorough review of record, we make the following de novo assessment of the percentages of fault:

 Sara Dunham 5 %
 Lezle Dunham 50 %
 Capitol Motor Company 22.5 %
 Ford Motor Credit Company 22.5 %
 Total 100%

Mrs. Dunham's Damages
We further find manifest error in the jury's determination that Mrs. Dunham suffered no damage as a result of the forgery of her signature on the loan documents. At the very least, Mrs. Dunham was inconvenienced in having to undertake legal action to prove she did not owe the debt. Further, credible testimony was introduced into evidence showing that the stress associated with the incident aggravated Mrs. Dunham's pre-existing medical conditions. However, we also note that the duration of the collection efforts by Ford lasted, at most, only five months (from October 2003 through March 2004).[8] Consequently, we find a total award of $5,000.00 for damages to Mrs. Dunham is appropriate in this case.
Having decided this case on the bases stated herein, we find it unnecessary to address the remaining assignments of error.

CONCLUSION
For the reasons assigned, the judgment of the district court is reversed and judgment is rendered as stated herein. All costs of this proceeding are to be borne in equal portions by Capitol Motor Company and Ford Motor Credit Company.
JUDGMENT REVERSED AND RENDERED; MOTION TO STRIKE EXCEPTION OF PRESCRIPTION DENIED; EXCEPTIONS OF PRESCRIPTION DENIED.
NOTES
[1] Although Lezle was denominated "Lezle Dunham-Hartman" in the original petition filed by Ford in this case and had so signed her name in the finance documents at issue, in her answer to this suit Lezle stated her name as "Lezle Dunham" and noted that she was "[previously named as `Lezle Dunham-Hartman']."
[2] The February 6, 2003 "vehicle retail installment contract" signed by Lezle was on a "Ford Credit" form, but Capitol was named as the "creditor." However, the Capitol "retail purchase order" listed Ford as providing financing for the loan. No assignment documents were introduced into the record to show the terms of the assignment of the loan from Capitol to Ford.
[3] Both Lezle and her mother, Sara Dunham, maintained homes in both Sante Fe and Baton Rouge.
[4] Louisiana Civil Code Article 1832 provides: "When the law requires a contract to be in written form, the contract may not be proved by testimony or by presumption, unless the written instrument has been destroyed, lost, or stolen."
[5] Louisiana Civil Code Article 1837 provides: "An act under private signature need not be written by the parties, but must be signed by them."
[6] Louisiana Civil Code Article 1846 provides: "When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence. If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances."
[7] We find no merit in Ford's defense based on the Federal Credit Reporting Agency Law (15 U.S.C. 1681, et seq.). We place particular emphasis on 15 U.S.C. § 1681 s-2(a)(1)(A), which provides: "A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." Further, § 1681 s-2(a)(1)(B) of the statute states: "A person shall not furnish information relating to a consumer to any consumer reporting agency if (i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and (ii) the information is, in fact, inaccurate." In this case, Mrs. Dunham's communications to Ford, both verbally and in writing through her attorney, sufficiently placed Ford on notice that it was incorrect in its belief that Mrs. Dunham was obligated to pay the loan at issue. Ford was thus obligated to make further inquiry into the validity of the debt before continuing its collection efforts against Mrs. Dunham. See 15 U.S.C. § 1692g (requiring a creditor obtain verification of a debt that has been disputed and cease collection of the debt during the verification process).
[8] Ford dismissed its suit in March 2004, and although later in the course of the litigation Ford filed a joint motion with Mrs. Dunham to have its prior dismissal vacated, it appears to have been for procedural reasons related to the maintenance of Mrs. Dunham's recoventional demand rather than any recurrence of Ford's efforts to collect the debt from Mrs. Dunham. The record does not reflect that Ford has taken any prosecutorial steps with respect to the claims asserted in its original petition against Mrs. Dunham. We further note that the trial held October 27-30, 2008 was limited to the claims asserted by Mrs. Dunham in her reconventional demand, and the resulting judgment was a final judgment in accordance with LSA-C.C.P. art. 1915(A).